Juli Farris (Bar No. 141716)
jfarris@kellerrohrback.com
Matthew J. Preusch (Bar No. 298144)
mpreusch@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1129 State Street, Suite 8
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

Robert Lawrence Lieff (No. 037568)
rlieff@lchb.com
Robert Nelson (No. 132797)
rnelson@lchb.com
Elizabeth J. Cabraser (No. 83151)
ecabraser@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
(415) 956-1000, Fax (415) 956-1000

***Attorneys for Plaintiff***
***(Additional Counsel on Signature Page)***

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK HICKS, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>PLAINS ALL AMERICAN PIPELINE, LP, a Delaware limited partnership, PLAINS PIPELINE, L.P., a Texas limited partnership, and JOHN DOES 1 through 10,<br><br>Defendants. | Case No.<br><br>**COMPLAINT – CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

# I.    INTRODUCTION

Plaintiff Mark Hicks ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following against Plains All American Pipeline, L.P., Plains Pipeline, L.P., and John Does 1-10  ("Defendants" or "Plains"), based where applicable on personal knowledge, information and belief, and the investigation and research of counsel.

## II.    NATURE OF THE ACTION

1.    On the morning of May 19, 2015, a 24-inch oil pipeline in Santa Barbara, California known as Line 901 and owned and operated by Defendants ruptured. For Defendants, Texas-based companies, ruptured pipelines are nothing new; since 2006, federal agencies have cited them for at least 175 safety and maintenance violations. What made this failure different, however, was that this pipeline runs along the edge of the Pacific Ocean, and the rupture sent thousands of gallons of toxic crude oil flowing over some of the most beautiful beaches and pristine waters in California.

2.    Before Defendants managed to shut off Line 901, it had discharged over 100,000 gallons of crude oil. Oil coated the shoreline, clinging to rocks, sand, and the animals it touched. Oil floated out to sea, creating a slick that stretched for miles, contaminating several State Marine Conservation Areas along the way, and forcing the closure of beaches, fishing grounds, and shellfish operations.

3.    These waters are home to hundreds of sensitive animal species, and serve as the backbone of the local economy. Tourists come to these beaches to enjoy the unspoiled sand and water. People support themselves and their families by harvesting fish and shellfish from these waters. All that has been damaged by this spill, and that damage will likely last for decades.

4.    This depressingly familiar story could have been averted had Defendants installed an automatic shut-off valve on the pipeline. Such systems are

not new or novel; they are ubiquitous on pipelines across the country. In fact, Line 901 is the only pipeline of its kind in Santa Barbara County without this key safety feature.

5.     The absence of an automatic shut-off system is no accident. When Defendants, through their predecessor in interest, built the pipeline in 1987, Santa Barbara County demanded that it install such a shut-off system and allow the County to inspect the welds on the pipeline. Rather than doing the responsible thing and installing safety systems and protocols, as all the other pipeline owners in the area had done, Defendants sued, arguing that the County lacked the authority to force them to install an automatic shut-off system or inspect its pipeline. As a result, Line 901 has no automatic shut-off system, and now more than 100,000 gallons of crude oil pollutes the waters and beaches on which the people and wildlife of this region depend.

6.     Plaintiff Mark Hicks brings this action pursuant to Federal Rule of Civil Procedure 23 on his own behalf and as a representative of others similarly situated to recover significant economic losses they have incurred and will continue to incur because of Defendants' oil spill.

### III.   PARTIES

7.     Plaintiff Mark Hicks is a resident of Santa Barbara County, California.

8.     Defendant Plains All American Pipeline, L.P. is a Delaware limited partnership with its principal place of business in Houston, Texas. Defendant operates through or on behalf of PAA GP LLC, a Delaware limited liability company; Plains AAP, L.P. ("AAP"), a Delaware limited partnership that is the sole member of PAA GP LLC; Plains All American GP LLC ("GP LLC"), a Delaware limited liability company; Plains GP Holdings, L.P. ("PAGP"), a Delaware limited partnership that is the sole member of GP LLC; and PAA GP Holdings LLC, the general partner of PAGP.

9.     Defendant Plains Pipeline, L.P. is a Texas limited partnership with its principal place of business in Houston, Texas. Plains Pipeline, L.P. is a subsidiary of Plains All American Pipeline, L.P.

10.     On information and belief Defendants John Doe 1 through 10, are corporations or partnerships, the names and addresses of residence of which are currently unknown.

11.     Defendants own and operate the All American pipeline system, a common carrier crude oil pipeline system that transports crude oil produced from two outer continental shelf fields off the California coast via connecting pipelines to refinery markets in California. The system receives crude oil from ExxonMobil's Santa Ynez field at Las Flores and receives crude oil from the Freeport-McMoRan-operated Point Arguello field at Gaviota.

## IV.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5 million, exclusive of interest and costs, and members of the proposed class are citizens of different states than Defendants.

13.     This Court has personal jurisdiction over Defendants because they are registered to conduct business in California, and have sufficient minimum contacts with California.

14.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## V.     FACTS

### A.     The Gaviota Coast

15.     The Gaviota Coast north of Santa Barbara is a special place. Its blue waters and beautiful coastline are home to an abundance of life, including critical

populations of endangered Snowy Plovers, seals, migrating whales, and myriad fish. For those reasons, the area is often called North America's Galapagos.

16.    Because of this natural bounty and beauty, as long as people have lived in North America, they have lived on the Gaviota Coast. Today, the economic life in this region revolves around its waters and beaches. Thousands of people in Santa Barbara County depend on the ocean and beaches for their jobs – fishing, tourism, and recreation in the region rely on them.

17.    For example, a 2009 report by the California Department of Fish and Game found annual ex-vessel revenues for fishing vessels in Santa Barbara County of $6.5 million. That includes important near shore fisheries like crab, lobster, and sea urchin.

18.    Now contamination by Defendants' oil spill has undermined the health of the environment on which that economy depends.

19.    Threats to the Gaviota Coast and Santa Barbara's environment and economy from oil development are not new. In 1969, a blowout at Union Oil's off-shore drill rig sent millions of gallons of oil into the waters and onto the beaches of Santa Barbara County. The blowout killed thousands of birds, dolphins, fish, and other marine life.

20.    Despite that disaster, the oil industry has only continued to grow in and around Santa Barbara County. Today, however, governments and some companies have taken significant steps to make the production and transportation of crude safer and more reliable. Defendants, on the other hand, are notable for their track record of doing otherwise.

**B.    The Failure of Defendants' Line 901**

21.    Line 901, a 10-mile long, 24-inch wide pipeline owned and operated by Defendants, runs along the edge of the Pacific Ocean, transporting up to 6,300,000 gallons of oil a day between Gaviota and Las Flores. The route takes the

pipeline past several state parks and beaches, including Refugio State Beach, carrying crude from offshore platforms inland, and from there to refineries.

22.     On the morning of May 19, 2015, Line 901 ruptured near Refugio State Beach, spilling toxic oil onto the beach and into the Ocean.

23.     As oil poured out of the ruptured pipe, neighbors and beachgoers began to be overwhelmed by the smell of oil. At approximately 11:30 a.m. the Santa Barbara County Fire Department responded to reports of the odors, and arrived to find oil flowing from the pipeline, through a storm drain under Highway 101, across the beach, and into the Pacific Ocean. Oil continued to leak from the pipeline until approximately 3 p.m.

24.     Initially, the oil covered the beach and rocks just below the failed pipe. But once it reached the water, the oil spread quickly, travelling for miles out to sea. The oil fouled beaches for miles in each direction.  As of May 28, the spill had impacted up to 28 miles of coastline.

25.     While the precise timeline of events is still not known, it appears that Defendants did not promptly act to respond to signs of the pipeline failure or notify relevant government agencies. As California's two United States senators stated in a letter to Defendants, "we are concerned that Plains Pipeline may not have detected this spill or reported it to federal officials as quickly as possible, and that these delays could have exacerbated the extent of the damage to the environment." The senators called Defendants' response "insufficient."

26.     Indeed, many witnesses who visited Refugio State Beach the night of the spill reported little or no response. Even the next day, as professional clean-up crews began to respond to Refugio State Beach, the response at other nearby beaches was left to volunteers with little or no training or protective equipment, using nothing but shovels and five-gallon buckets to try to remove thousands of gallons of crude from the sand and sea.

27.    Despite the efforts of those volunteers and professional responders, the scope of the spill continues to expand. It has already impacted numerous Marine Protected Areas that provide vital breeding and feeding grounds for marine species, as shown in this map prepared by the GreenInfo Network:



28.    As the oils spreads, so do its terrible consequences. Numerous, fish, birds, and marine mammals have died after being covered in oil or exposed to the oil's toxic compounds. Tar balls are washing up on beaches far to the south and east of Refugio. Frisbee-sized "oil pancakes" are drifting toward Channel Islands National Park. An oil-covered duck recently appeared at Alice Keck Park in downtown Santa Barbara, trying to clean itself in a decorative pond.

Those are the visible harms, relatively easy to see and tally. Beneath the ocean's surface, however, a largely unseen catastrophe is unfolding. There, as the oil sinks and swirls in the tides and currents, it is likely suffocating sea grass, clinging to kelp beds, smothering reefs, and otherwise seeping into the aquatic food chain

through shellfish and plankton. Dead bass, lobsters, crabs, octopi and other species that live beneath the surface offshore have already begun washing up on area beaches.

29.    In Santa Barbara, those environmental impacts translate to profound economic impacts.  In the short term, the oil from Defendants' ruptured pipeline has closed fishing grounds and shellfish areas, and caused canceled reservations from tourists who otherwise would be spending their money on hotels, restaurants, kayaking or surf trips, and fishing charters

30.    For example, state officials have closed these key coastal fishing areas from Canada de Alegeria to Coal Oil Point, including the shoreline and offshore areas between those points to 6 miles offshore. Even after that closure is lifted—and that could be months away—the spill's impacts on those fisheries will continue far into the future. Also, the negative publicity from the spill has and will deter seafood buyers from seeking out Santa Barbara seafood.

31.    The spill has also discouraged tourists from visiting businesses in Santa Barbara County, where tourism (along with agriculture and wine) accounts for roughly 15 percent of the workforce, or over 36,000 jobs. For example, one local kayaking company reported 25 cancellations following the spill, resulting in a loss of approximately $3,000. Two popular state beaches—Refugio and El Capitan—were closed during one of the busiest holiday weekends of the year, and both are expected to remain closed until at least June 25, 2015.

On May 19, 2015, a privately owned crude oil pipeline ruptured, causing an oil spill within and around Refugio State Beach. State beaches affected by this incident include Refugio and El Capitan near Goleta.

**Both beaches are closed until further notice.**

Camping reservations have been cancelled through June 25th, 2015 in an effort to expedite clean-up efforts. Campers with reservation during this time will be provided a full refund through Reserve America.

Visitors wanting to find alternative overnight camping opportunities should contact a Reserve America representative at 1-800-444-7275 to locate campgrounds nearby.

For current beach areas open for day use during the holiday weekend in Santa Barbara and Ventura counties, visitors should call (805) 585-1850. This site will be updated with information when made available. We apologize for any inconvenience.

32.     Finally, the oil spill presents a serious risk to human life. The Santa Barbara County Health Department has recommended that residents avoid all areas affected by the spill, but a major highway runs through and adjacent to the spill area. Refugio Beach is considered a "Hazmat area," the County said. The County also warned that direct contact with oil, inhalation of fumes, or ingestion of contaminated fish or shellfish can cause skin irritation, nausea, vomiting, and other illnesses.

33.     Long term, the impacts may be as-yet-unknown, but they are no less certain. Even with the best spill response, toxic oil will remain in the environment for a long time, continuing to harm water, wildlife, and beaches. Recently, five years after the Deepwater Horizon oil spill in the Gulf of Mexico, officials assessing the damage to that ecosystem said "the environmental effects of this spill is likely to last for generations." So too with this spill, which will cause similarly long-lasting environmental and economic impacts.

## C.     Plains Has a Long History of Recklessly Avoiding Installing Safety Equipment

34.     While this spill is a disaster, it is not an accident. Defendants wantonly disregarded the health and safety of the people and environment by operating a pipeline it knew did not have proper safety systems in place.

35.     In 1987, when Defendants constructed Line 901, Santa Barbara County's Energy Division sought to ensure the pipeline was constructed properly by, among other things, inspecting the welds on the pipeline using x-rays. The Division routinely inspected welds on new pipelines, as a way to ensure they had been done correctly to reduce the risk of failure. The Division also ordered Defendants to install an automatic shut-off valve system on the pipeline to ensure the pipeline would shut down swiftly, and without having to wait for human action, at the first sign of a problem in the pipeline.

36.     Rather than agreeing to these commonplace and common-sense safety protocols, Defendants instead fought the County, suing it in U.S. District Court in 1987 and arguing it lacked jurisdiction to regulate its pipeline design and installation.

37.     As a result, today Line 901 in the only pipeline in Santa Barbara County "whereby the county is preempted from monitoring and safety inspections," said Kevin Drude, Director of the County's Energy Division. Drude has publicly said that Defendants' employees rarely, if ever, attend monthly meetings that he holds to discuss safety concerns with all the pipeline operators under his jurisdiction.

38.     Also as a result of its lawsuit against the County, today Defendants operate the only pipeline of its type in the County without an automatic shut-off valve system. For those reasons, it is the only pipeline that is capable of failing and discharging more than 100,000 of gallons of oil.

39.     While Santa Barbara, its citizens, and environment bore the risk, and now reality, of a catastrophic pipeline failure, Defendants have reaped rising profits, estimated at roughly $389 million on over $2 billion in earnings. By avoiding the cost of safety equipment and systems, Defendants boosted their profits by transferring the cost of failure to people who live and work in Santa Barbara County.

40.     The lax safety standards at Line 901 were not isolated incidents for Defendants. Since 2006 Plains has been cited for more than 175 violations of safety requirements, which have caused nearly $24 million in property damage. Eleven of those incidents were in California. Plains is one of the top four most-cited pipeline operators in the country.

41.     Even more alarming is that, according to federal statistics analyzed by the website The Smart Pig Blog, the "number of incidents on crude oil pipelines operated by [Plains] . . . is increasing faster than the national average," as shown in this chart:



42.     Last year, for example, a pipeline owned and operated by Defendants ruptured in a Los Angeles neighborhood, covering the streets, cars, houses, and businesses in oil. The cause: a poorly maintained pipeline. A few years ago, another poorly maintained Plains pipeline ruptured and sent oil into a drinking water reservoir for Los Angeles.

43.     In 2010, pursuant to a Consent Decree filed by the U.S. EPA following numerous alleged violations of the Clean Water Act by Defendants in several states, Defendants represented that it would update its procedures such that the "[i]f there is an unexplained increase in delivery flow-rate with corresponding decrease in pressure – [Plains would] SHUTDOWN the affected line segment."

44.     As part of that settlement, Defendants paid a $3.25 million penalty for 10 spills between June 2004 and September 2007 that discharged a total of roughly 273,420 gallons of crude oil into navigable waters or adjoining shorelines in Texas, Louisiana, Oklahoma, and Kansas,

45.     Plains itself recently acknowledged in a disclosure report to the U.S. Securities and Exchange Commission that it has "experienced (*and likely will experience future*) releases of hydrocarbon products into the environment from our pipeline . . . operations" that "may reach surface water bodies." (Emphasis added).

46.     In short, Plains has an ugly tradition of operating pipelines that fail. The communities through which it transports oil suffer the consequences.

47.     Defendants have profited and continue to profit from their failure to comply with local, state, and federal requirements and guidelines, and its decision not to repair and/or replace Line 901.

48.     Defendants knew of the extremely high risk of catastrophic injury inherent in the transportation of oil through a pipeline. Notwithstanding, Defendants took no action to prevent or protect Plaintiff and the Class. Indeed, Defendants actively avoided taking action to protect Plaintiff and the Class from

apparent risks its Line 901 pipeline presented. Defendants demonstrated a callous and reckless disregard for human life, health, and safety by operating Line 901 without proper safety equipment. This disregard for human life and safety at Line 901 is part of a pattern and practice that Defendants have demonstrated across the country. Defendants acted with such indifference to the consequences of its misconduct, with such recklessness, and as part of a well-established pattern, as to be willful, malicious, and oppressive, and in disregard of the rights of the Plaintiff, thereby meriting an award of punitive or exemplary damages against Defendants.

49.    This lawsuit therefore seeks to compensate the victims of the spill and to ensure that Defendants are prevented from causing additional damage to Santa Barbara County's economy and environment in the future.

## VI.    PLAINTIFF'S FACTS

### A.    Plaintiff Mark Hicks

50.    Mark Hicks, a resident of Santa Barbara, is a tour and event guide and is the owner of Captain Jack's Santa Barbara Tours ("Captain Jack's"), a 10-year old business that offers kayaking, sailing, beach, wine, and horseback tours, including tours at Refugio State Beach.

51.    Before Defendants' oil spill, Mr. Hicks had been having one of his best years yet.  Profits for the first four months of the year were approximately 20 percent higher than in previous years. For the first part of May, Captain Jack's was booking roughly $1,800 worth of trips each day, with one of the busiest holiday weekends of the season, Memorial Day weekend, yet to come.

52.    Then Defendants spilled over 100,000 gallons of crude oil in Santa Barbara County, and the phones in Captain Jack's office became unseasonably quiet. After Defendants' spill, Captain Jack's bookings dropped off to an average of $800 per day for the remainder of May.  For the same period last year, Captain Jack's averaged roughly $1,500 to $2,000 per day in bookings.

53.     Since Defendants' oil spill, a number of customers have cancelled their bookings. For instance, four customers who had booked kayaking trips to Refugio State Beach cancelled their reservations, with two of those customers rescheduling less profitable tours in the Santa Barbara harbor.

54.     On information and belief, Defendants' oil spill has decreased tourism to the Santa Barbara area, which in turn has further exacerbated the decrease in bookings experienced by Captain Jack's.

55.     Mr. Hicks believes the negative consequences of Defendants' oil spill will continue to depress his business for the remainder of the year and for years to come.  Defendants' acts and omissions have therefore caused present injury to Mr. Hicks, as well as the concrete risk of imminent, additional injury.

## VII.   CLASS ACTION ALLEGATIONS

56.     Plaintiff brings claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the class of similarly situated persons. Plaintiff proposes to represent the following class:

> All businesses in the United States that claim economic losses, or damages to their occupations, businesses, and/or property as a result of Defendants' May 19, 2015 oil spill from Line 901.

57.     The class members are ascertainable and have a well-defined community of interest among their members.

58.     **Ascertainability:** Although the Class is, the precise number of members can be ascertained in at least two ways. First, because the members of the proposed Class live in a geographically confined area, providing notice to them via newspapers, trade publications, and other routine avenues of communication will be easily accomplished. Second, Defendants' records – such as logs of complaints

from affected class members – will also serve to ascertain potential Class members.

59.     **Numerosity**: The members of the Class are so numerous that joinder of all members would be impractical.  The proposed Class likely contain hundreds of members.

60.     **Commonality:** There are common questions of law and fact that predominate over any questions affecting only individual members of the Class.

61.     For Plaintiff and the Class, the common legal and factual questions include, but are not limited to, the following:

a)     Whether Defendants acted negligently and/or fraudulently to cause the spill;

b)     Whether Defendants had installed and maintained adequate safety measures and systems on Line 901 and in its systems of command and control to prevent the spill;

c)     Whether Defendants conducted adequate supervision that could have prevented the spill could be prevented;

d)     Whether Defendants engaged in unconscionable, deceptive, and/or unreasonable business practices and conduct;

e)     Whether Defendants knowingly, intentionally, or negligently concealed, suppressed, or omitted material facts concerning the safety of its pipeline from the public;

f)     Whether Defendants knowingly, intentionally, or negligently concealed, suppressed, omitted, or delayed relaying material facts regarding the spill to local, state, and federal agencies, thereby slowing the response, and/or increasing the damages to Plaintiff and members of the Class;

g)      Whether the Class suffered injury by virtue of Defendants' negligence, recklessness, carelessness, and/or unconscionable and/or deceptive business practices; and,

h)      Whether Defendants are strictly liable to Plaintiff and the Class, by virtue of State and/or Federal Law.

62.     **Typicality**: The representative Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all the members of the Class have been injured by the same wrongful acts and omissions of Defendants.  Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories.

63.     **Adequacy of Representation**: Plaintiff is a representative who will fully and adequately assert and protect the interests of the Class, and has retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiff nor his attorneys have any interests contrary to or in conflict with the Class.

64.     **Rule 23(b)(3)**: In addition to satisfying the prerequisites of Rule 23(a), Plaintiff satisfies the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual class members and a class action is superior to individual litigation. The amount of damages available to individual plaintiff is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

65.     **Rule 23(b)(2)**. Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the proposed class, making final declaratory or injunctive relief appropriate with respect to the proposed class as a whole.

66.     **Rule 23(c)(4)**. Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(c)(4). The claims of class members are composed of particular issues that are common to all class members and capable of class wide resolution that will significantly advance the litigation.

## VIII.  CAUSES OF ACTION

### First Claim for Relief
### Strict Liability under Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Government Code Section 8670, *et seq.*

67.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

68.     The Lempert-Keene-Seastrand Oil Spill Prevention and Response Act provides that "[a]ny responsible party, as defined in Section 8670.3, shall be absolutely liable without regard to fault for any damages incurred by any injured party which arise out of, or are caused by, the discharge or leaking of oil into or onto marine waters." Cal. Gov. Code Section 8670.56.5(a).

69.     The Pacific Ocean and the waters off the Gaviota Coast are "marine waters" as defined in Section 8670.03(i).

70.     Defendants are "responsible part[ies]," which is includes "the owner or transporter of oil or a person or entity accepting responsibility for the oil."

71.     The oil transported through Line 901 is "oil" within the meaning of the Act, which defines "oil" as "any kind of petroleum, liquid hydrocarbon, or petroleum products or any fraction or residues therefrom," including "crude oil."

17

72.    As the responsible party for the oil transported through Line 901, Defendants are absolutely liable under the Lempert-Keene-Seastrand Act.

73.    On May 19, 2015, Defendants discharged or leaked crude oil into the Pacific Ocean, and is therefore absolutely liable without regard to fault for all damages that Plaintiff and Class sustained or will sustain. That discharge was not permitted by state or federal law.

74.    The Act entitles a plaintiff to recover a wide variety of damages, including, but not limited to, loss of subsistence use of natural resources; loss of taxes, royalties, rents, or net profit shares caused by the injury, destruction, loss, or impairment of use of real property, personal property, or natural resources; and loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources. *See generally* Cal. Gov. Code Section 8670.56.5(h).

75.    The contamination illegally caused by the discharge of crude oil from Line 901 into or upon area beaches and the Pacific Ocean injured, caused to be lost, and/or impaired the use of property or natural resources on which Plaintiff and the Class depend for their livelihood, including, but not limited to, local beaches and marine waters; populations of fish, and shellfish; and marine ecosystems.

76.    The injury, destruction, loss, and/or impairment of usability of these natural resources has caused Plaintiff and the Class to lose profits, and will caused future losses or profits and/or impair their earning capacities.

77.    The long-lasting effects of the contamination of the discharge of toxic crude oil into the Pacific Ocean on marine life on which Plaintiff and the Class rely, requires that Plaintiff and the Class continue future monitoring and testing activities in order to ensure such marine life is not contaminated and is safe and fit for human consumption.

## Second Claim for Relief
### Strict Liability for Ultrahazardous Activities

78.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

79.     At all times herein, Plains is the owner and operator of the oil pipeline known as Line 901.

80.     At all times relevant to this action, Defendants had supervision, custody, and control of Line 901.

81.     At all times herein, Defendants were under a continuing duty to protect the Plaintiff and the Coast from the harm caused by Line 901.

82.     Defendants were engaged in an ultrahazardous activity by transporting flammable, hazardous, and toxic oil through its pipeline.

83.     Plaintiff and the Class have suffered harm from the discharge of toxic oil from Defendants' Line 901.

84.     The injuries sustained by Plaintiff as a result of the oil spill were the direct and proximate result of Defendants' activity.

85.     The harm to Plaintiff and the Class, was of the kind of harm that would reasonably anticipated as a result of the risks created by transporting flammable, hazardous, and toxic oil in a pipeline in close proximity to the Pacific Ocean.

86.     Defendants' operation of Line 901 and its failure was a substantial factor in causing the harms suffered by Plaintiff and the Class.

87.     Due to Defendants' strict liability, Plaintiff and Class members are entitled to recover actual damages.

88.     The acts and omissions of Defendants were done with malice, fraud, and/or oppression as set out in this Complaint.

### Third Claim for Relief
**Negligence**

89.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

90.     Defendants owed a duty to Plaintiff and the Class to exercise reasonable and ordinary care. That duty arose from, among other things, federal, state, and local laws that require Defendants to operate a pipeline in a manner that does not damage public health and safety.

91.     Defendants breached that duty to Plaintiff and the Class by, among other things, failing to install reasonable safety equipment to prevent a spill, and failing to promptly respond to and contain the spill.

92.     Defendants, in the exercise of reasonable care, should have known that Line 901 could rupture or otherwise fail, and spill significant amounts of oil. Defendants has acknowledged that spills such as this have occurred on its pipelines in the past and will occur again.

93.     As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have sustained damages.  Those damages take primarily two forms: short-term and long-term.

94.     The short-term damages include loss of profits due to fishing closures caused by the spill, and increased costs associated with traveling to different fisheries. The closures have excluded fishers from near shore fishing grounds for lobster, crab, shrimp, and other species. The short-short term damages also include lost profits due to cancellations from tourists who, but for the spill, would have used services offered by business in Santa Barbara County, or simply visited Santa Barbara County and businesses there.

95.     The long-term damages include future lost profits due to the harm caused to the fisheries themselves. For example, the oil is likely to depress or even

eradicate in some areas populations of sea urchins, crab, lobster, and other crustaceans by directly killing numbers of those species or hindering their breeding and feeding. Similarly, oil that sinks below the surface will poison fish and potentially smother their eggs, limiting their future numbers.

96.     Finally, the taboo associated with an oil spill has and will continue to drive down the price of local fish and shellfish, and consumers and fish processors become wary of producing locally-caught species.

97.     Similarly, the image of the Gaviota Coast as a pristine place and as a perfect place to vacation has been tarnished. Images of oil soaked birds, dead dolphins, and fouled beaches now show up prominently in internet searches for "Santa Barbara Beaches" and will dissuade people from visiting the region and the many businesses that depend on tourism and other visitors.

## Fourth Claim for Relief
### Violations of California's Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, *et seq.*

98.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

99.     Defendants have engaged and continue to engage in unfair competition in violation of the Act.

100.   Defendants' conduct constitutes "fraudulent" business practices within the meaning of the Act in that members of the public have been harmed.

101.   Defendants' conduct amounts to "unfair" business practices as the Act forbids all wrongful business activities in any context in which they appear. Moreover, as described above, Defendants' practices offend established public policies, are immoral, unethical, oppressive, and unscrupulous. The impact of Defendants' practices is in no way mitigated by any justifications, reason, or

motives. Defendants' conduct has no utility when compared to the harm done to Plaintiff and members of the Class.

102.   Defendants' conduct was "unlawful" because it violated laws including but not limited to the Lempert-Keene Act, Government Code Section 8670, *et seq.*, and the Porter-Cologne Act, Water Code Sections 13000, *et seq.*, and Cal. Fish & Game Code Section 5650, *et seq. inter alia*, the Oil Pollution Act, and the oil spill response plans required by federal, state, and local laws. Federal, state, and local officials have announced civil and criminal investigations into Defendants' conduct related to the spill, so it is reasonable to infer that Defendants may have violated other laws.

103.   As a direct and proximate result of Defendants' unfair, fraudulent, and unlawful methods of competition and unfair and deceptive acts or practices, Plaintiff and the Class have sustained damages.

104.   As a proximate result of Defendants' unfair methods of competition and unfair and deceptive acts or practices, Defendants have been unjustly enriched and should be required to make restitution payments to Plaintiff and the Class pursuant to Bus. & Prof. Code §§ 17203 and 17204.

105.   The acts and omissions of Defendants were done with malice, fraud, and/or oppression as described in this Complaint.

<u>**Fifth Claim for Relief**</u>
**Negligence Per Se**

106.   Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

107.   At all times herein mentioned, Defendants negligently, wantonly, carelessly and/or recklessly maintained and operated Line 901.

108.   Defendants violated several statutes, ordinances, or regulations including but not limited to the Lempert-Keene Act, Government Code Section

8670, *et seq.*, and the Porter-Cologne Act, Water Code Sections 13000, *et seq.*, and Cal. Fish & Game Code Section 5650, *et seq.*

109.   As a direct and legal cause of the Defendants' wrongful acts and omissions herein above set forth, Plaintiff and the Class have suffered and will suffer economic harm, injury, and losses.

110.   Plaintiff's harm resulted from the occurrence of the nature that the laws listed above were designed to prevent, and Plaintiff is a member of the class of persons for whose protection those laws were adopted.

111.   The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as described in this Complaint.

### Sixth Claim for Relief
### Public Nuisance

112.   Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

113.   Defendants have created a condition that is harmful to health and interferes with the comfortable enjoyment of life and property by discharging up to 101,000 gallons of crude oil onto the beaches of Santa Barbara County and the Pacific Ocean.

114.   That nuisance affects a substantial number of individuals similarly situated to the Plaintiff, such as residents and visitors to Santa Barbara County, commercial fishers, and businesses that rely on the safe and healthy environment in the county.

115.   The oil spill is a condition which would reasonably annoy and disturb an ordinary person, as shown by, for example, the health impacts warned of by the county, the community outrage in response to the spill, and the nationwide interest in the spill's impact's on the Gaviota Coast.

116.   The seriousness and gravity of that harm outweighs the social utility of Defendants' conduct. There is little or no social utility associated with releasing tens of thousands of gallons of oil into the unique ecological setting of Santa Barbara County.

117.   Plaintiff and the Class suffered harm and injury to their economic livelihood, which they did not consent to and which is different from the type of harm suffered by the general public.

118.   The above acts and omissions also created a public nuisance *vis-a-vis* the Plaintiff and the Class, interfering with the property rights of Plaintiff and the Class, and rights incidental to those property rights.

119.   The acts and omissions of Defendants described herein were also in violation of various California state laws including but not limited to the Lempert-Keene Act, Government Code Section 8670, *et seq.*, and the Porter-Cologne Act, Water Code Sections 13000, *et seq.*, and Cal. Fish & Game Code Section 5650, *et seq.*

120.   Defendants' violations of those statutes directly and proximately caused, and will cause, injury to the Plaintiff and the Class of a type which the statutes are intended to prevent. Plaintiff and the Class are of the class of persons for whose protection these statutes were enacted.

121.   As a direct and legal cause of Defendants' wrongful acts and/or omissions herein above set forth, Plaintiff and the Class have suffered and will suffer economic harm, injury, and losses as herein above set forth.

122.   To remedy the harm caused by Defendants' nuisance, Plaintiff will seek public injunctive relief, including, but not limited to, an order requiring Defendants to restore fisheries impacted by the spill and to repair reputational damage done to Santa Barbara's seafood industry.

123.   In maintaining the nuisance, which is ongoing, Defendants are acting with full knowledge of the consequences and damage being caused, and the acts and omissions of Defendants, were done with malice, fraud, and/or oppression as described in this Complaint.

**Seventh Claim for Relief**
**Negligent Interference With Prospective Economic Advantage**

124.   Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

125.   Plaintiff and the Class had existing or prospective economic relationships with residents of Santa Barbara County, visitors to Santa Barbara County, and other individuals and organizations doing business in and related to Santa Barbara County.

126.   These relationships had a reasonably probable likelihood of resulting in future economic benefits or advantages to Plaintiff and the Class.

127.   Defendants knew or should have known of these existing and prospective economic relationships.

128.   Defendants owed a duty to Plaintiff and the Class to avoid negligent or reckless conduct that would interfere with and adversely affect the existing and prospective economic relationships of Plaintiff and the Class.

129.   Defendants breached that duty to Plaintiff and the Class by, among other things, failing to install reasonable safety equipment to prevent a spill, and failing to promptly respond to and contain the spill.

130.   Defendants knew or should have known that, if they failed to act with reasonable care, the existing and prospective economic relationships of Plaintiff and the Class would be interfered with and disrupted.

131.   Defendants were negligent and failed to act with reasonable care as herein set forth above.

132.   Defendants engaged in wrongful acts and/or omissions as herein set forth above, including but not limited to their violations of federal, state, and local laws that require Defendants to operate a pipeline in a manner that does not damage public health and safety.

133.   As a direct and proximate result of Defendants wrongful acts and/or omissions, Defendants negligently and recklessly interfered with and disrupted the existing and prospective economic relationships of Plaintiff and the Class.

134.   As a direct and proximate result of Defendants' wrongful acts and/or omissions, Plaintiff and the Class have suffered and will suffer economic harm, injury, and losses as herein set forth above.

### Request for Relief

Plaintiff, individually and on behalf of all others similarly situated, requests judgment against Defendants as follows:

A.   For an order certifying the Class and appointing Plaintiff as a representative of the Class and appointing the lawyers and law firms representing Plaintiff as counsel for the Class;

C.   Permanently enjoining Defendants from operating a pipeline in Santa Barbara County without adequate safety and response measures;

D.   For all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the Class, including disgorgement, unjust enrichment, and all other relief allowed under applicable law;

E.   Granting Plaintiff and the Class awards of restitution and/or disgorgement of Defendants' profits from its unfair and unlawful practices described above;

F.   For costs;

G.   For both pre-judgment and post-judgment interest on any amounts awarded;

H.      For appropriate injunctive relief, including public injunctive relief; *i.e.*, an order requiring Defendants to restore fisheries impacted by the spill and to repair reputational damage done to Santa Barbara's seafood industry;

I.      For treble damages insofar as they are allowed by applicable laws;

J.      For appropriate individual relief as request above;

K.      For payment of attorneys' fees and expert fees as may be allowable under applicable law, including the Private Attorneys General Act ("PAGA"), Cal. Code. Civ. P., § 1021.5;

L.      For exemplary or punitive damages under Cal. Civ. Code Section 3294 for the oppression, fraud, and malice alleged above; and

M.      For such other and further relief, including declaratory relief, as the Court may deem proper.

## IX.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 16th day of June, 2015.

KELLER ROHRBACK L.L.P.

By */s/Juli E. Farris*

Juli Farris (Bar No. 141716)
jfarris@kellerrohrback.com
Matthew J. Preusch (Bar No. 298144)
mpreusch@kellerrohrback.com
Keller Rohrback L.L.P.
1129 State Street, Suite 8
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

Gretchen Freeman Cappio*
gcappio@kellerrohrback.com
Daniel Mensher*
dmensher@kellerrohrback.com
Keller Rohrback L.L.P.
1201 Third Ave, Suite 3200
Seattle, WA 98102-3-25
(206) 623-1900, Fax (206) 623-3384

Robert Lawrence Lieff (No. 037568)
rlieff@lchb.com
Robert Nelson (No. 132797)
rnelson@lchb.com
Elizabeth J. Cabraser (No. 83151)
ecabraser@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
(415) 956-1000, Fax (415) 956-1000

*Attorneys for Plaintiff*
*\* Pro Hac Vice forthcoming*